Matter of A.H. (2007 NY Slip Op 27098)

Matter of A.H.

2007 NY Slip Op 27098 [15 Misc 3d 677]

March 9, 2007

DiDomenico, J.

Family Court, Richmond County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, May 30, 2007

[*1]
In the Matter of A.H. and Another, Children Alleged to be Neglected. Victor H., Respondent.
Family Court, Richmond County, March 9, 2007

APPEARANCES OF COUNSEL

Michael A. Cardozo, Corporation Counsel, Staten Island (James O'Hare of counsel), for petitioner. Legal Aid Society, Staten Island (Lori Landowne of counsel), Law Guardian. Lawrence S. Goldman, New York City (Anne D'Elia of counsel), for respondent.
OPINION OF THE COURT

Catherine DiDomenico, J.
By petition dated June 20, 2006, petitioner, the Administration for Children's Services (ACS), commenced this neglect proceeding against respondent, Victor H. The petition alleges that, on June 14, 2006, respondent's wife, Hejin (who died in the incident) and his two daughters, E. and A., three and five years of age, respectively, drove in the family minivan to Bear Mountain State Park located in New York state. Mr. H. is alleged to have left the minivan and to have watched as his wife drove off a cliff with the children inside. Respondent is accused of driving his children to this location when he knew (or should have known) that his wife intended to commit suicide there and of otherwise failing to take any action to protect his children.
ACS remanded the children on June 23, 2006. On June 29, 2006, after a hearing held pursuant to Family Court Act § 1027, this court found that allowing the children to return to the care and custody of respondent would constitute imminent risk to their life, health or safety and, therefore, would be contrary to their best interest and welfare. The children remain in ACS' custody, and are placed with Ms. Hejung B., their maternal aunt and decedent's sister.
Respondent is being prosecuted by the Rockland County District Attorney's office on charges of promoting a suicide attempt, reckless endangerment and endangering the welfare of a child in a criminal proceeding based on the underlying events. Respondent was arraigned on [*2]these charges on or about November 15, 2006.
Prior to commencement of this fact-finding hearing, ACS notified the court of its intention to call respondent as a witness at trial and asked this court to draw an adverse inference against respondent in the event he chose to exercise his Fifth Amendment right against self-incrimination. Respondent argued that, if he testified at this trial, then his testimony could be used against him at his criminal trial. While noting the difficult choice faced by respondent in this civil proceeding, this court granted ACS' application.
This matter proceeded to fact-finding on December 11, 2006, December 14, 2006 and December 18, 2006. ACS called three witnesses: Investigator Brendon T. of the New York State Police; Ms. Hejung B., the decedent's sister; and Victor H., the respondent father. Respondent called no witnesses. Decision was reserved for submission of written summations.

Findings of Fact

After considering the testimony of the witnesses who testified at the fact-finding hearing and observing their demeanor, this court credits the testimony of petitioner's witnesses and makes the following findings of fact after trial:
On June 15, 2006, shortly after 2:00 p.m., respondent was transported to the New York State Police barracks for an interview and polygraph examination before Investigator T. of the New York State Police. After completion of the running of the first polygraph chart, respondent told Investigator T. that there was no "need to go through the polygraph right now"; respondent would tell Investigator T. "exactly what happened." (Transcript, Dec. 11, 2006, at 15.) Respondent then told the following to Investigator T.:
On June 15, 2006, respondent and his wife attended a preschool graduation ceremony for their daughter, A. They discussed how to spend the day. Respondent suggested a visit to Battery Park; respondent's wife stated she wanted to go to Bear Mountain "to take some photographs."
According to respondent, this phrase was significant to him because it referred to his own suicide attempt made in February 2006. At that time, respondent stated he went to Bear Mountain with the intention of killing himself. His plan was thwarted, however, when Perkins Memorial Drive, the road that lead to the highest elevation, was closed due to weather conditions. Before leaving for Bear Mountain that day, he told his wife he wanted to go there "to take photographs." He also had recently secured a $1 million life insurance policy on his life. He went home that night and wrote a letter to his wife detailing his suicide attempt.
Respondent told Investigator T. that, because of his own prior suicide attempt in February 2006, he understood his wife's request on June 15, 2006 to go to Bear Mountain to "take photographs" as indicating that she wanted to commit suicide at that location by jumping off a [*3]cliff as he had attempted to do earlier that year. Respondent's belief was supported by the fact that his wife had been depressed.
Respondent told Investigator T. that, upon arriving at Bear Mountain, respondent entered Perkins Memorial Drive and drove up to the top of the tower. Respondent's wife asked respondent "is this a good spot?" Respondent exited the vehicle, inspected the area, got back in the van and said "no."
Respondent then continued down to a lower level on Perkins Memorial Drive. He made a small U-turn when he saw three men sitting on a rock. He told Investigator T. that he was glad it "wasn't him on this date" since he wasn't sure he could go through with "it" knowing people were watching. As he went to turn the vehicle toward the exit, the decedent allegedly said "I told you I want to take a photograph here." Knowing there was no film in the cameras, and no batteries in the camcorder, respondent turned the vehicle around again and returned to that elevation for a second time, where he parked the minivan.
Respondent exited the vehicle and crossed the street. According to respondent, he began to hear the rolling of the tires on the ground. He turned around and allegedly saw his wife "straddling" the center console of their vehicle. He "stood there and watched" as the minivan containing his wife and children rolled toward the opening between the two boulders. It was not until respondent allegedly saw the face of his three-year-old daughter that he tried to grab the rear of the minivan. The vehicle careened off the cliff where it finally came to its final resting place below. Respondent's wife was killed and his two children were slightly injured as a result of this incident.
On the subject of why his children were brought to Bear Mountain, respondent indicated that the children were there to witness the fact that he was not near his wife at the time of the act, as follows: "Well, I would have been up where I was standing away from the vehicle, and my five year old daughter would have witnessed her jumping off, and, therefore, the two stories would have been matched." (Transcript, Dec. 11, 2006, at 22.)
Ms. B., the decedent's sister, also testified at the fact-finding hearing. She stated that A. told her that her "Mommy" did not want to go to Bear Mountain that day; that "Mommy" slept all the way to Bear Mountain and was asleep when the minivan went over the cliff; and thereafter "Mommy" "bled" a lot.
Ms. B. also testified that respondent told her that he carried his wife to the minivan and placed her in the vehicle for the Bear Mountain trip because she was too weak to walk herself, although she did attend the preschool ceremony earlier that day. Ms. B. stated her sister had not been eating and had been depressed because she believed respondent was having a relationship with another woman.
[*4]
ACS called respondent as its final fact-finding witness. When respondent was asked if Investigator T. accurately testified as to respondent's statements during the June 15, 2006 interview, if respondent had any information as to how the family vehicle came to go over the cliff, and if respondent was to gain financially or otherwise from the death of his wife, respondent invoked his Fifth Amendment right against self-incrimination. For the reasons set forth in this court's order dated December 7, 2006, this court draws the strongest adverse inference against respondent as a result of his invoking his Fifth Amendment right against self-incrimination in this child protective proceeding.

The Applicable Law

A neglected child is defined as a child
"whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his [or her] parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof." (Matter of Antonio NN., 28 AD3d 826, 826 [3d Dept 2006]; Family Ct Act § 1012 [f] [i] [B].)
The statute establishes a "minimum baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet." (Matter of Jessica YY., 258 AD2d 743, 744 [3d Dept 1999].) "Under such standard, parental behavior [is] evaluated objectively [according to] whether a reasonable and prudent parent would have so acted." (Id. [internal quotation marks omitted], quoting Matter of Katherine C., 122 Misc 2d 276, 278 [Fam Ct, NY County 1984].)
To establish neglect, petitioner must show, by a preponderance of credible evidence, that the child has been harmed or threatened with harm. (See Matter of Evelyn X., 290 AD2d 817, 819 [3d Dept 2002]; Matter of Christopher JJ., 281 AD2d 720, 720-721 [3d Dept 2001].) A single isolated incident may be sufficient to constitute child neglect if the parent was aware of, or should have been aware of, the intrinsic danger of the situation. (Matter of Victoria CC., 256 AD2d 931, 932-933 [3d Dept 1998]; see Matter of Jerrica J., 2 AD3d 1161, 1163 [3d Dept 2003].) After considering the evidence adduced at this trial, this court credits the testimony of Investigator T. and Ms. B. and finds that petitioner has proved that respondent has neglected these children by allowing them to remain alone with the decedent who respondent believed was suicidal.
Respondent argues that in order for a neglect finding to be entered against him, ACS must prove that his wife actually committed suicide. This court disagrees. Whether decedent's death was caused by suicide, or by some affirmative act or omission by respondent, is not pertinent here. Rather, the only question before this court is whether respondent failed to exercise a minimum degree of care in protecting his two children when he strapped them in their car seats and drove them to Bear Mountain to witness what respondent believed would be the attempted suicide of their mother or to otherwise serve as potential witnesses to that act. As respondent's own statements to Investigator T. make clear that respondent believed his wife wanted to go to Bear Mountain to kill herself, his decision to bring his children along demonstrates such [*5]profound parental carelessness and lack of judgment as to make this court seriously concerned about the life, health and welfare of these children should they be returned to respondent at this time. (Nicholson v Scoppetta, 3 NY3d 357, 376 [2004], citing Matter of Adam DD., 112 AD2d 493 [3d Dept 1985] [child placed with Department of Social Services where evidence demonstrated respondent mother told child on several occasions that she intended to kill herself]; Matter of Caleb C., 11 AD3d 737 [3d Dept 2004] [neglect finding entered against respondent mother who failed to seek mental heath treatment while experiencing suicidal thoughts].)
Respondent contends that his statements to Investigator T. were made "under extreme emotional conditions and influenced by suggestion and guilt" and given in response to "highly suggestive and emotionally charged questions." (Respondent's summation at 4.) After listening to Investigator T.'s testimony at trial and watching him testify, this court concludes that there is nothing in this witness' testimony which would suggest that respondent's statements were involuntarily made or otherwise improperly elicited. Furthermore, respondent has not taken the stand or otherwise submitted any affirmative proof in support of his characterization of the circumstances surrounding his interview with Investigator T.
Respondent also makes much of his alleged attempt to rescue his children after seeing the face of his three-year-old daughter through the rear window of the minivan as it went off the cliff. Even if true, respondent's actions to save his children would not preclude a neglect finding here because respondent created the very life threatening situation he claims to have tried to rescue them from. The court further notes that respondent saved himself from injury by exiting the vehicle before it careened off the cliff, but failed to exercise the same degree of care or concern for his two young daughters who remained strapped in the back seat. Against these facts, a neglect finding may be made. (See, e.g., Matter of Edward C.L., 292 AD2d 282 [1st Dept 2002] [where respondent engaged in conduct in child's presence which created risk of emotional or mental impairment, neglect finding was appropriate].)

Conclusion

For the reasons set forth herein, the court finds that petitioner has proved, by a preponderance of the evidence, that respondent father neglected the subject children as alleged in the petition.